UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-15-12
                    TS
```

- - - - - - - - - - - - - - - - - x
                :

UNITED STATES OF AMERICA
                :

    - v. -
                :     S1 11 Cr. 724 (KMW)

FRANK SMITH III, et al.,
                :     OPINION & ORDER

         Defendant.   :

- - - - - - - - - - - - - - - - - x
KIMBA M. WOOD, U.S.D.J.:

     Defendant Frank Smith III ("Smith") is charged in a one-count indictment with conspiracy to distribute and possess with intent to distribute 5 kilograms and more of cocaine and 1 kilogram and more of heroin, in violation of 21 U.S.C. §§ 841 and 846.  On December 19, 2011, Smith moved to suppress evidence seized during a search of his apartment (the "Apartment") on the ground that the search violated his rights under the Fourth Amendment of the Constitution.  (See Dkt. No. 23.)  Smith argued that the search, conducted pursuant to a consent form signed by Smith's co-resident, was unconstitutional because Smith had expressly refused consent to the search while present in the Apartment, and this refusal overrode any consent given by his co-resident. (Id.)

     On January 31, 2012, in response to Smith's motion, the Government requested an evidentiary hearing to resolve the limited factual question of whether Smith had expressly refused

1

consent to a search of the Apartment upon his arrest therein. On February 16, 2012, the Court conducted the evidentiary hearing, at which Smith and several officers involved in his arrest testified.  The Court found credible the testimony given by both Smith and the officers, but determined that it was more likely than not that Smith had expressly voiced his objection to a search.  (Evid. Hr'g Tr. 77:9-15, Feb. 16, 2012.)[1]  The Court also found that the police officers did not deliberately disregard Smith's refusal to consent; rather, the Court determined that it was likely that the officers did not hear Smith's statement given the noise and confusion in the residence during Smith's arrest. (Tr. 77:7-78:3.)  Based on those findings, the Court orally granted Smith's suppression motion.

The Government now moves for reconsideration of that order, on the ground that, assuming the search was unconstitutional, the Court did not fully assess whether, in light of its factual findings, suppression is the appropriate remedy for the constitutional violation.  (See Dkt. No. 29.)  For the following reasons, the Court GRANTS the Government's motion for reconsideration, and upon reconsideration, DENIES Smith's motion to suppress the evidence seized during the search of his Apartment.

---

[1] All references to the transcript of the February 16, 2012 hearing are denoted herein as "Tr."

2

I.  **BACKGROUND**[2]

On the morning of September 13, 2011, DEA agents, assisted by local police officers in Fairview, New Jersey, executed an arrest warrant for Smith at Smith's Apartment, which he shared with his girlfriend.  Two local officers knocked on the Apartment's front door while one DEA agent stood immediately behind them.  (Tr. 18:19-24, 26:15-21.)  When Smith opened the door, the local officers asked him to step outside because of a suspected gas leak in the Apartment.  (Tr. 7:2-4, 49:1-2; see also Declaration of Frank Smith ("Smith Decl."), dated Dec. 15, 2011 ¶ 2.)  As Smith stepped outside, the officers arrested him without providing any warnings of the rights guaranteed to him under Miranda v. Arizona, 384 U.S. 436 (1966).  (Tr. 13:1-2, 23:5-9, 33:16-17.)  A second DEA agent then joined the arresting officers.  (Tr. 39:19-23.)

At the evidentiary hearing, as well as in a declaration submitted in support of his suppression motion, Smith testified that upon his arrest, he twice told the arresting officers[3] that he would not speak to them without a lawyer, and that he did not consent to a search of the Apartment or a lineup.  (Smith Decl.

---

[2] The following facts are derived from testimony given at the February 16, 2012 evidentiary hearing and from the Declaration of Frank Smith ("Smith Decl."), dated December 15, 2011, which was submitted in support of Smith's motion to suppress.  (Dkt. No. 24.)

[3] Smith could not recall whether he made the statements to the three officers who initially arrested him or to all four once the second DEA agent arrived. (Tr. 54:3-13.)

¶ 2; Tr. 49:7-9.)  However, each of the four officers involved in the arrest testified either that they never heard Smith state that he refused consent to a search, (see, e.g., Tr. 20:19-25, 27:13-28:6;), or that they did not have a specific recollection of hearing Smith refuse consent to a search (see, e.g., Tr. 7:17-8:4, 39:24-40:3.)  One of the officers testified that, upon being arrested, Smith invoked only his right to counsel.  (Tr. 33:7-20.)  Each officer also testified that had he heard Smith refuse consent to a search, it was something he would have remembered because of its significance, and that had he heard it, he would not have conducted the search.  (See Tr. 10:13-11:10, 20:23-25, 40:4-19, 45:2-10.)

After being taken inside the Apartment, Smith was escorted to his upstairs bedroom, where his girlfriend was located, in order to retrieve some clothing to wear to the police station.[4] (Smith Decl. ¶ 2; Tr. 49:21-50:6.)  Smith testified that, as he was being led back down the staircase to the main floor of the Apartment, he shouted to his girlfriend: "Don't give them permission to search anything."  (Smith Decl. ¶ 2; Tr. 50:7-12.) Smith averred that he shouted this statement loudly enough for

---

[4] Two of the three officers who were asked about this topic corroborated Smith's testimony that he was taken upstairs; the remaining officer testified that Smith remained downstairs at all times.  (Tr. 13:9-12, 34:15-20, 41:21-42:7.)  The weight of the evidence supports a finding that Smith was in fact taken upstairs at some point during his arrest.

his girlfriend, and for any law enforcement officers in the vicinity of the staircase, to hear it.  (Tr. 59:5-14.)

Each officer testified that he was at all times within earshot of Smith and the staircase such that he would have heard Smith shout, and that at no time did he hear Smith say or shout anything about not permitting law enforcement to search the Apartment.  (See, e.g., Tr. 9:14-25, 11:7-16, 12:5-7, 21:18-22:12, 29:4-10, 41:5-42:23.)  The parties stipulated that, consistent with this testimony, if Smith's girlfriend were called to testify, she would state that she never heard Smith say anything to either her or to law enforcement officials about searching the Apartment.[5]  (Tr. 69:19-70:13.)

After Smith was removed from the Apartment, the officers obtained a signed, consent-to-search form from Smith's girlfriend.  As a result of that search, the officers found a scale, a money counter, and cutting agents used to dilute narcotics for distribution.

At the evidentiary hearing, the Court made the following findings of fact:

> This is probably the closest case I've ever had
> in terms of credibility.  I know there are a number of

---

[5] Smith also testified that, after he had been arrested and was being held on the main floor of the Apartment, he may have told a fifth officer, "I'm sorry, I can't consent to you guys searching my house.  I know you guys have a job [to do], but I have to protect my rights."  (Tr. 60:6-61:21.)  When called to testify, the officer in question averred that he never heard Smith say anything about refusing to consent to a search of the Apartment.  (Tr. 67:11-68:5.)

officers who have testified and I found them credible.
I also found the defendant credible.

I think it is more likely than not that if the
defendant said, without having been Mirandized, if he
said "I'm not going to speak without a lawyer," it is
likely that he would have known to say he did not
consent to a search and hence it is likely that he
said it.

I think in the noise, confusion, having many
people around, it is quite possible that Mr. Smith's
girlfriend did not hear him say, "don't consent to a
search," and yet he may have said it.  There was so
much going on all at once.

So, I think it comes down to what more likely
happened in all of the noise and confusion.  And I
think it's more likely that Mr. Smith, after saying he
wanted a lawyer, also said he did not consent to a
search.  So I'm going to grant the motion to suppress.

I recognize that this is unusual in light of so
many officers' testimony.  And I did believe the
officers.  I just think that what the defendant said
probably did not stick in their minds in light of
everything that was going on.

(Tr. 77:7-78:3.)

The parties dispute whether the Court's finding that
Smith's statement "did not stick in [the officers'] minds" was a
finding that the officers did not hear Smith refuse to consent,
or a finding that the officers heard the statement but did not
pay attention to it.  (See Def.'s Mem. in Opp. to Govt's Mot.
for Recons. at 5.)  The Court now clarifies for the record that
its finding is that, in light of the noise and confusion
attending the arrest, the officers did not hear Smith refuse
consent to a search, just as Smith's girlfriend stipulated that
she did not at any point hear Smith refuse consent.

6

Based on its factual findings, the Court concluded that the search violated the Fourth Amendment because Smith's explicit refusal of consent rendered invalid his girlfriend's subsequent consent.  See Georgia v. Randolph, 547 U.S. 103, 122-23 (2006) ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.")  The Court therefore suppressed the evidence obtained as a result of the unconstitutional search.

## II.   MOTION FOR RECONSIDERATION

### A.   Standard of Review

Neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules of the United States District Courts for the Southern and Eastern Districts of New York contemplate motions for reconsideration; in the absence of an analogous criminal rule, courts in these districts have long applied Local Civil Rule 6.3 to reconsideration motions in criminal cases. See United States v. Yannotti, 457 F. Supp. 2d 385, 388-89 (S.D.N.Y. 2006) (Scheindlin, J.).

Reconsideration of a court's prior order "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." Cordero v. Astrue, 574 F. Supp. 2d 373, 380 (S.D.N.Y. 2008) (Marrero. J.) (internal quotation marks omitted).  A motion for

7

reconsideration "is not intended to be a vehicle for a party
dissatisfied with a court's ruling to advance new theories that
the movant failed to advance in connection with the underlying
motion, nor to secure a rehearing on the merits with regard to
issues already decided." Cordero, 574 F. Supp. 2d at 380.  A
court should therefore reconsider its prior decision only if the
moving party can point to "controlling decisions or data that
the court overlooked . . . [and] that might reasonably be
expected to alter the conclusion reached by the court." Shrader
v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also
Cordero, 574 F. Supp. 2d at 379.

   **B.  Analysis**

   The Government does not challenge the Court's finding that
the search of the Apartment was conducted in violation of the
Fourth Amendment.  Rather, it argues that the Court erred in
automatically suppressing the evidence obtained from the search
after it determined that the search was unconstitutional.

   Under Herring v. United States, 555 U.S. 135 (2009), a
Fourth Amendment violation does not automatically result in the
suppression of evidence obtained as a result of the violation.
Rather, "the exclusionary rule . . . applies only where [it
serves the purpose of] deterring Fourth Amendment violations in
the future," id. at 141, and where "the benefits of [such]
deterrence . . . outweigh the costs . . . [of] letting guilty

and possibly dangerous defendants go free . . . ."  Id.  In
light of those costs, the Herring Court concluded that "[t]o
trigger the exclusionary rule, police conduct must be
sufficiently deliberate that exclusion can meaningfully deter
it, and sufficiently culpable that such deterrence is worth the
price paid by the justice system."  Id. at 144.

   The Government argues that, under Herring, the Court
erroneously excluded the evidence seized during the search of
Smith's Apartment because, as the Court determined, the
arresting officers did not deliberately ignore Smith's refusal
to consent to the search; in other words, their conduct was not
"sufficiently deliberate" such that exclusion would meaningfully
deter future constitutional violations of this type.

   Smith opposes reconsideration on the ground that the
Government could have raised the issue of whether exclusion is
the appropriate remedy in its initial response to Smith's
suppression motion.  (See Def.'s Mem. in Opp. to Govt's Mot. for
Recons. at 2-3.)  However, as the Court stated in its April 4,
2012 order for further briefing on the Government's motion,
(Dkt. No. 35), it appears that neither party anticipated that
the Court would credit both Smith's and the officers' testimony,
and find that although Smith had expressly refused consent, the
officers did not deliberately ignore his statement.

The Court's factual findings call into question whether the officers' conduct was "sufficiently deliberate" to warrant suppression under Herring.  Because the parties did not anticipate that the Court would find as it did, they did not fully address this issue prior to the evidentiary hearing.  The Court will therefore reconsider its prior ruling so that it may determine whether suppression of the evidence seized at the Apartment would serve the purpose of deterring future Fourth Amendment violations of this type, and whether the benefits of deterrence outweigh the costs of excluding the evidence.

## III.  MOTION TO SUPPRESS

### A.  Applicable Law

The Fourth Amendment guarantees "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' but 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'"  Herring, 555 U.S. at 139 (quoting Arizona v. Evans, 514 U.S. 1, 10 (1995)).  In order to safeguard this right, the judiciary has established the exclusionary rule, which prohibits the use of improperly obtained evidence at trial.  The rule seeks to effectuate the Fourth Amendment's guarantees by deterring future violations by law enforcement.  See United States v. Calandra, 414 U.S. 338, 348 (1974) ("'The rule is calculated to prevent, not to repair.  Its purpose is to

10

deter — to compel respect for the constitutional guaranty in the
only effectively available way — by removing the incentive to
disregard it.'") (quoting Elkins v. United States, 364 U.S. 206,
217 (1960)).

However, "[t]he fact that a Fourth Amendment violation
occurred - i.e., that a search or arrest was unreasonable - does
not necessarily mean that the exclusionary rule applies."
Herring, 555 U.S. at 140; see also United States v. Julius, 610
F.3d 60, 66 (2d Cir. 2010) ("[A]pplication of the exclusionary
rule is not a matter of right upon a finding that an improper
search has taken place."). The Herring Court made clear that
courts should exclude evidence pursuant to the rule only when
two requirements are met: First, the rule should be applied
"only where it results in appreciable deterrence" of future
Fourth Amendment violations.  555 U.S. at 140.  Second, "the
benefits of deterrence must outweigh the costs" of letting a
guilty defendant go free because of the exclusion of improperly
obtained, but potentially probative, evidence.  Id. at 141.

In light of that substantial cost, exclusion is appropriate
only where the police conduct that caused the violation is
"sufficiently deliberate that exclusion can meaningfully deter
it, and sufficiently culpable that such deterrence is worth the
price paid by the justice system." Id. at 144.  The Herring
Court defined that conduct as limited to "deliberate, reckless,

or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id.; see also id. at 147 ("[W]e conclude that when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way.") (internal quotation marks omitted).

To determine whether the conduct at issue is both sufficiently deliberate and sufficiently culpable, a district court should ask "'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" Id. at 145 (quoting Leon v. United States, 468 U.S. 897, 922 n.23 (1984)). Suppression is warranted "'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Id. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).

**B.  Analysis**

As an initial matter, Smith contends that Herring is inapplicable to the facts of this case. He argues that Herring's conclusion that the exclusionary rule does not apply where "the error was the result of isolated negligence attenuated from the arrest," 555 U.S. at 137, was limited to such circumstances where the error is made by a neutral third

12

party — that is, by someone other than the officer who conducts the arrest or search.  (See Def.'s Supplemental Mem. in Supp. of Mot. to Suppress ("Def.'s Supplemental Mem.") at 2.)  In Herring, the defendant sought to exclude evidence seized from his vehicle during a search incident to his arrest.  The defendant's arrest was based on misinformation from law enforcement officers in a neighboring county, who, as the result of "negligent bookkeeping," had misrepresented that there was an outstanding arrest warrant for the defendant.  555 U.S. at 137. The Court concluded that the exclusionary rule did not apply because the bookkeeping error was "isolated negligence attenuated from the arrest," and therefore not sufficiently deliberate or culpable to warrant application of the exclusionary rule.  Id.

Although the facts of Herring, and its statement that the negligence there was "attenuated from the arrest" lend some support to Smith's view that the holding in Herring should be limited to instances of negligence by neutral third parties, the Second Circuit reads Herring's holding more broadly, and has applied Herring to cases in which the Fourth Amendment violations were committed by the same officers who conducted the searches of the defendants' residences.  See, e.g., United States v. Julius, 610 F.3d 60 (2d Cir. 2010); United States v.

13

Rosa, 626 F.3d 56 (2d Cir. 2010).[6]  In United States v. Julius,

the Circuit expressly acknowledged that the error was not

attenuated from the search, but held that the district court

should nonetheless assess whether suppression was appropriate

under the Herring framework.  610 F.3d at 67.  This extension is

appropriate in light of the Herring Court's analysis, which

focused on the fact that the error was in fact isolated

negligence and not more.  See 555 U.S. at 140 ("The [district]

court . . . concluded that this error was negligent, but did not

find it to be reckless or deliberate.  That fact is crucial to

our holding that this error is not enough by itself to require

the extreme sanction of exclusion.") (internal quotation marks

omitted).  This Court thus assesses Smith's motion under

Herring's instruction that "a court should order exclusion only

after it has satisfied itself that 'the benefits of deterrence .

. . outweigh the costs." Julius, 610 F.3d at 66 (quoting

Herring, 555 U.S. at 141).

     In this case, the benefits of deterrence are marginal.  As

the Herring Court stated, "the exclusionary rule serves to deter

deliberate, reckless, or grossly negligent conduct, or in some

---

[6] Smith argues that Julius is inapposite because the defendant in that case was
a parolee with diminished expectations of privacy in his residence.  (Def.'s
Supplemental Mem. at 4.)  However, the Court specifically declined to
adjudicate the suppression motion on that basis; it instead assessed the
decision in light of Herring, and remanded it to the district court with
instructions to determine whether the benefits of deterring future Fourth
Amendment violations outweighed the costs of suppression.  610 F.3d at 67.

circumstances recurring or systemic negligence." 555 U.S. at 144. The Court has credited the officers' testimony that they did not deliberately disregard Smith's refusal to consent to a search, but rather did not hear Smith make a statement to that effect. (Tr. 77:7-78:3.) Their failure to hear him constituted, at the most, an isolated instance of negligence; there was no evidence that their conduct rose to the level of deliberate or reckless conduct, or gross, recurring, or systemic negligence. The evidence suggested only that, in the midst of the noise and confusion that ensued during the arrest, the officers simply did not hear Smith, just as Smith's girlfriend did not hear him. On those facts, the officers reasonably believed that they were authorized to search the Apartment after obtaining the consent of Smith's girlfriend.

Smith argues that exclusion of the evidence has deterrent value insofar as suppression would "encourage[e] arresting officers to pay attention to a defendant's assertion of rights." (Def.'s Supplemental Mem. at 6.) Although suppression may hypothetically have this effect, such deterrence is insufficient to warrant application of the exclusionary rule: "Even assuming that the rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter

15

objectively reasonable law enforcement activity." United States v. Leon, 468 U.S. 897, 919 (1984). As noted, in light of all the circumstances, the officers' reliance on Smith's girlfriend's consent was objectively reasonable.

Moreover, "[t]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial social costs." Herring, 555 U.S. at 141 (internal quotation marks omitted). Smith argues that the scale, money counter, and cutting agents that were recovered during the search do not constitute the "primary inculpatory evidence" against him, such that "the impact of suppression is less severe than it would be when the primary evidence of the crime is suppressed."[7] (Def.'s Supplemental Mem. at 5-6.) However, the cost of suppression is not measured based on its impact relative to the cost of suppression of other, possibly more probative evidence. The cost is paid when suppression impedes "the criminal justice system's truth-finding function [and allows] some guilty defendants [to] go free." Leon, 468 U.S. at 907; see also United States v. Payner, 447 U.S. 727, 734 (1980) ("[T]he suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a

---

[7] Defense counsel represents that the primary evidence to be used against Smith will be a video tape and testimony of an undercover agent. (Def.'s Supplemental Mem. at 6.)

16

criminal case."). Here, evidence of Smith's possession of these items is probative and significant to the Government's case at trial, and its suppression would undoubtedly exact "a costly toll upon truth-seeking and law enforcement objectives." <u>Herring</u>, 555 U.S. at 141.

In sum, the deterrent effect of suppression in this case is far from substantial, and any marginal deterrence that would result is outweighed by the costs of exclusion. <u>See Herring</u>, 555 U.S. at 147 ("[T]he deterrent effect of suppression must be substantial and outweigh any harm to the justice system.") The Court therefore denies Smith's motion to suppress the evidence seized during the search of his Apartment.

## IV.  CONCLUSION

For the forgeoing reasons, the Court, upon reconsideration, DENIES Smith's motion to suppress.


        SO ORDERED.

Dated: New York, New York
       May 15, 2012

                              Kimba M. Wood
                        Kimba M. Wood
                  United States District Judge


17